## [No. 2987.]

## W. J. KAIN *v.* THE STATE.

1. EXHIBITING A GAMING TABLE.—CONTINUOUS OFFENSES.—The exhibition of a gaming table, for the purpose of obtaining betters, which is the gist of the offense, is not an offense continuous in its nature, within the meaning of the law. See the opinion *in extenso* on the question.

2. PRACTICE—AUTREFOIS ACQUIT AND CONVICT—BURDEN OF PROOF.— When a defendant interposes the plea of *autrefois acquit* or *convict*, the burden of proving the identity of himself as the party formerly acquitted or convicted and the identity of the offense, is upon him; and the State can under no circumstances be required to establish the contrary.

3. SAME.—PROOF OF IDENTITY OF THE OFFENSE is not made by proof that the offense of which the defendant has been acquitted or convicted, and that for which he is on trial, are identical in nature, name and designation; but it must be made by showing the identity of the very acts or omissions which constituted the offense—that the acts which constituted the offense for which the former acquittal or conviction was had are the very acts which constitute the offense on trial.

4. SAME.—It has been stated as a rule that "the burden of proving a prior conviction of the offense charged against a defendant being upon him, it is not shifted by *prima facie* evidence of the identity of the offense of which he has been previously convicted with that charged upon him." This rule, without modification, does not hold good in this State; for if the evidence makes a *prima facie* case in support of the plea, it must preponderate in its favor, and a preponderance of proof will suffice to support the plea.

5. SAME—CASE STATED.—The information in this case charges the appellant with *keeping* the gaming table as well as *exhibiting* the gaming table. The verdict and judgment fail to show for which (the keeping or the exhibiting of the same) the appellant was convicted, and it is therefore urged by appellant that he is relieved from the burden of proving the identity of the offense. *Held*, that the proposition is untenable; that, though it be conceded that the keeping of a gaming table is an offense continuous in its nature, the exhibition of a gaming table is not; and, to be available, the evidence in support of the plea of former acquittal or conviction must meet the whole case, and is not sufficient if it leaves it in doubt whether the former conviction was had for the keeping or the exhibition of the table.

6. SAME—JURISDICTION.—In opposition to the plea of former conviction in this case, it is urged by the State that, it being shown that the informa- tion in this case was pending in the county court at the time that a simi- lar complaint was filed in the mayor's court (a court clothed with con- current jurisdiction), even though the proof were sufficient to establish the identity of the offense, the plea could not prevail, inasmuch as, under the circumstances, the mayor's court could not have acquired legal juris- diction. *Held*, that the position is not tenable, and that, if the proof was sufficient to establish that the offense tried by the mayor's court was iden- tical with the offense being tried by the county court, the plea of former conviction would prevail in bar of a prosecution in the county court. See the opinion on the question.

7. SAME—PRIVILEGE OF WITNESS.—Article 367 of the Penal Code provides that "any court or officer having jurisdiction of the offenses enumerated in this chapter, or any district or county attorney, may subpœna persons and compel their attendance as witnesses. Any person so summoned and examined shall not be liable to prosecution for any violation of said arti- cles about which he may testify." *Held*, that this privilege, which is ex- tended to the witness merely to exempt him from prosecution under evi- dence which he might give criminating himself, is limited to the identical acts about which he testified, and to that extent will protect him; but it cannot be extended to any broader protection than that of which he has been deprived. Inasmuch as the record in this case fails to disclose that the defendant testified about the particular transaction for which he was on trial, his plea of privilege cannot avail him.

8. SAME—FACT CASE.—See evidence *held* insufficient to support special pleas of former acquittal, former conviction and privilege.

APPEAL from the County Court of Dallas. Tried below before the Hon. R. E. Burke, County Judge.

The information in this case charged that the appellant kept and exhibited, and was interested in keeping and exhibiting, a keno table, in the city of Dallas, Texas, on the fourth day of September, 1883. The trial of the appellant resulted in his con- viction, and his punishment was affixed at a fine of twenty-five dollars.

The State introduced Dick Nelms, who, being sworn, deposed that he was a professional gambler, and, in August, 1883, re- sided in the city and county of Dallas, Texas. The witness, at that time, was at work exhibiting a keno game for the defend- ant, William J. Kain. He exhibited a keno game for the said William J. Kain, in Dallas, on the night of September 4, 1883. The witness was hired by the said Kain to exhibit, or help exhibit, the game of keno. Persons bet on that game of keno on the night of September 4, 1883. The game of keno is

played with cards, balls, a globe, buttons, pegs, a pegging board and tables. The game exhibited by the witness for the said William J. Kain was the ordinary keno game, played on tables. It required from one to five minutes to play a game of keno. The game exhibited by the witness for defendant was kept open as long as the hall in which it was played was kept open. The hall was opened every night at about seven o'clock, and was kept open until twelve, one or two o'clock. It was so opened and kept open on the night of September 4, 1883. The State rested.

The defense first introduced city clerk John Carter, who testified that, on September 6, 1883, the defendant, William J. Kain, was tried and convicted in the mayor's court of the city of Dallas, upon a complaint which charged him with keeping and exhibiting, for the purpose of gaming, from the fifth day of March, 1883, to the fifth day of September, 1883, certain tables, including keno tables. Witness exhibited the complaint and judgment. On a similar complaint (which complaint and judgment were exhibited in evidence), covering the period from March 31, 1883, to October 26, 1883, the defendant was tried in the mayor's court of the city of Dallas, on the twenty-ninth day of October, 1883, and was convicted. On the same dates, September 6 and October 29, the defendant was fined in the said mayor's court on complaints for gaming.

The defendant was subpœnaed as a witness for the city of Dallas against Ed. Hennessey, Abe Sheppard, Jim Cornwall, Pat. Wilkerson, Dan. Stewart, Charles Mathews, Joe Orifice, Newt. Lacey, Dick Nelms, Tully Williams and Hugh McGin. The witness issued the subpœnas as city clerk. The names were given to the witness either by the city marshal or by some one of the policemen. Neither Mr. Cowart nor the defendant furnished witness the names. W. H. Johnson, Mr. Fields's assistant, represented the city on the sixth day of September. On the twenty-ninth day of October the defendant was subpœnaed by the city in the case against Ed. Hennessey, and was placed upon the stand by the city attorney, and questioned by him on behalf of the city. The ordinance of the city of Dallas against keeping and exhibiting gaming tables was passed July 10, 1883, was duly published, and went into effect ten days after publication.

It was agreed by the State and the defendant that the city ordinance against keeping and exhibiting, and being interested in

keeping and exhibiting, gaming tables is the same as chapter three, title eleven of the Penal Code of the State, except that the penalty attached to the offense in the city is free of costs, the fine being twenty-five dollars in both city and State as a minimum, and one hundred dollars maximum, with thirty days imprisonment allowed—the same period as that provided for by the State law—the ordinance of course being confined to the limits of the city of Dallas.  The incorporation of the city of Dallas was also admitted.  The amended charter of Dallas, passed March 31, 1883, and all ordinances enacted thereunder, were admitted to be in evidence.

The defense then read in evidence sections twenty-one, sixty-two and eighty-two of the said amended charter of the city of Dallas.  It was then admitted that the defendant was the same W. J. Kain who was tried and convicted in the mayor's court on September 6, 1883, and October 29, 1883.

R. E. Cowart was then called to the witness stand by the defense.  He testified that he was counsel for the defendant, and represented him on the trials in the mayor's court, on the sixth day of September and on the twenty-ninth day of October, on the complaints exhibited in evidence by the witness Carter.

The defendant Kain testified both on the sixth day of September, and on the twenty-ninth day of October, 1883, on behalf of the city in prosecutions against other parties.  On the sixth day of September he testified against Ed. Hennessey in the mayor's court, on a complaint which charged the said Hennessey with exhibiting the game of keno in the city of Dallas, during the period between the fifth day of May up to and including the fifth day of September, 1883.  On that trial the defendant was asked by the county attorney if Hennessey exhibited the game of keno between the dates mentioned and as mentioned in the complaint, and the defendant, as witness on that trial, replied:  "Yes." The witness, as Hennessey's attorney, asked him if the game of keno was exhibited every night in Dallas, from May 5, 1883, to September 6, 1883, inclusive, and also on the twenty-sixth day of October, 1883, and he replied:  "Yes, every night except Sunday nights."  The defendant also testified that he had an interest in the game on those dates.  In January, 1883, just before the Legislature was called upon to amend the charter of the city of Dallas, the gamblers of Dallas offered the witness twelve hundred and fifty dollars to have the charter so amended as to transfer to the city of Dallas sole and exclusive jurisdiction over

gambling cases arising in that city. The gamblers failed to raise the full amount of the fee and the matter was dropped, and another party went to Austin and worked to secure to the city jurisdiction in gambling cases. After the amendment of the city charter, it became a question as to how far a prosecution in the mayor's court would operate as a bar to a prosecution in the State court, and the witness had this fact in his mind when he defended the gaming cases in the mayor's court on the October trials. On those trials the witness asked all questions save those asked by the prosecuting attorney, and pursued such course as he thought would aid his clients in their contest in the county court, which he and his clients then knew to be pending. The defense closed.

Deputy county clerk Hughes, for the State, in rebuttal, testified that one hundred and nineteen cases were pending against the defendant for violations of the gaming laws. Sixteen of this number of complaints were filed September 5, 1883, the remaining one hundred and three between September 14 and October 15, 1883. Capiases on the complaints filed September 5 were issued the same day, and capiases on the complaints filed after that were issued between September 14 and October 15, 1883. At the request of the city attorney, whose object was to suppress from the gamblers, for the time being, all knowledge of the filing of the complaints, the witness, on the fifth day of September, took the complaints, including the sixteen against the defendant, above mentioned, to the county attorney's office, where, closing the door, he proceeded to issue capiases on them. While at work, filing the complaints, in the county attorney's office, in the manner and on the day stated, Mr. R. E. Cowart, the defendant's attorney, came into that office, walked up to the desk where the witness had the complaints and capiases before him, and looked over his, witness's, shoulders, where he remained a few minutes and then retired. Mr. Cowart did not ask for anything, nor did he say that he wanted anything. Witness informed the county attorney of this occurrence, and hurried up the issuance of the capiases, and placed them in the hands of the sheriff. The witness did not know whether or not Mr. Cowart saw or knew what he was doing. Defendant was arrested on those cases on the next day, September 6, 1883.

The first batch of complaints for gambling filed against Pat. Wilkinson were filed on the eleventh day of September, 1883. A large number of complaints for gambling against professional

gamblers, outside of Pat. Wilkinson's house, were filed in the county court on the fifth day of September, 1883. The lowest penalty assessable in the county court for exhibiting a keno table is a twenty-five dollar fine, and the lowest costs under a plea of guilty is twenty-seven dollars and forty cents.

The State then introduced the informations, indictments and capiases against the defendant, numbering one hnndred and nineteen; also informations and judgments of conviction and acquittal in cases numbers 4026, 4027 and 4028, in the county court. No. 4026, on which defendant was convicted, charged the offense of exhibiting a keno table on the twenty-seventh day of August, 1833. No. 4027, in which the defendant was also convicted, charged the same offense on the twenty-eighth day of August, 1883. No. 4029, in which defendant was acquitted, charged that the defendant, on the first day of September, 1883, kept and exhibited and was interested in keeping and exhibiting a certain gaming table and gaming bank.

Ed. Cornwall was the next witness for the State. He testified that he was deputy city marshal of Dallas. At the city hall, after supper, on the night of September 5, 1883, the witness assisted city marshal Arnold to make out complaints against all of the gamblers in Dallas. Marshal Arnold and witness wrote the complaints, and policeman Pat. Mullen signed them. Mullen, on the same night, took them up to the residence of General W. L. Cabell, mayor of Dallas, and made the necessary affidavit to each complaint. Warrants were then issued on each, sent to Mayor Cabell for signature, and delivered to the police for service. The defendant was one of a number of gamblers arrested that night, the various warrants being served between nine and twelve o'clock. Never before during the witness's service as deputy marshal had warrants against the gamblers been made out or served at night. The practice prior to September 5, 1883, had been not to arrest them at all, but simply file the affidavits against them, notify them that they had been fined, name the amount and collect the fine. Neither the city attorney nor his assistant had anything to do with filing the complaints on September 5, 1883. Neither of them were present, and if they knew anything about the proceedings on that night witness was not aware of it. Thirteen witnesses, all professional gamblers, were subpœnaed by the defendant Kain as witnesses. As many as eight were put on the stand and testified against him.

Among the professional gamblers who testified in the October

trial were A. W. Campbell, Pat. Wilkinson, Charles Mathews and Dan. Stuart. Mathews and Stuart both run faro banks near the defendant's gambling house. Campbell was not in Dallas during the spring and summer of 1883, but was off attending races in other States. The gambling houses in Dallas were closed about October 10, 1883, and have never been opened since, except for a short time on the night of October 26, 1883, for which arrests were made next morning. The only times the gamblers were arrested under the amended charter for plying their trade was on September 5 and October 26, 1883. Witness had never known the gamblers to contest their prosecutions, except in the September and October cases. The cases named were tried on those days without the intervention of a jury, and were submitted without argument. Mr. Field or Mr. Johnson, counsel for the city, would ask each witness a few questions for the city, and Mr. Cowart a few for the defendants, and upon the evidence thus elicited the cases were submitted. The various witnesses were subpœnaed by policemen. So far as witness knew, neither Kain nor his counsel had anything to do with filing the complaints nor having witnesses subpœnaed. Witness did not know whether the policemen obtained the names of the witnesses from the city or the defendant. All the papers in the cases were written by the policemen, except the subpœnas, which were written by the city clerk. The affidavits and warrants were written by witness and Arnold, from an old form for keeping disorderly houses. The parties who appeared as witnesses never claimed their attendance fees, nor were such fees taxed against the defendants in any of the cases. Prior to September, 1883, the gamblers had never been prosecuted in the early part of the month. Nor were they ever prosecuted for keeping or exhibiting gaming devices, but only for betting.

City attorney Frank Field was introduced by the defendant in rebuttal. He testified that he left Dallas for Wisconsin on the eighth day of August, 1883, and returned on September 12, 1883. Prior to his departure the witness had not drawn any complaints against the gamblers for exhibiting gaming. He had drawn some for keeping disorderly houses. A great deal of discussion as to the city's jurisdiction over gambling cases followed the adoption of the amended charter. Opinion varied as to whether the jurisdiction conferred by the amendment was concurrent or limited. The gamblers were first arrested under the amended charter on the fifth day of September, 1883. They

were arrested the second and last time on the twenty-seventh of October, 1883. The witness had nothing to do with the September cases, but wrote up some of the October cases. Mr. Johnson, witness's partner, wrote the October complaints. Witness was present at the trials on October 29, 1883, and examined the witnesses, all of whom were professional gamblers, and prosecutions against each of them were pending at the time. None of them refused or declined to testify, and they were present when called. None of them, on trial, claimed the privilege of exemption because of having testified. All of them were prosecuted on complaints similar to those against Kain, and they testified against each other with reference to the same game; for instance, Jim Cornwall, Abe Sheppard and Fred. White were each charged with exhibiting faro in Kain & Campbell's faro hall. Cornwall and Sheppard testified in the cases as to the commission of the offenses charged in each case, during the period from March 31 to October 26, 1883. Witness examined as many as eight witnesses in each case. Witness had nothing to do with having the witnesses subpoenaed. The leading gamblers of the city were put on the stand and asked by witness if the defendant in the particular case on trial exhibited the particular game or games named in the complaint, during the time named. After such questions were answered, the witness turned the several witnesses over to Mr. Cowart, who was the counsel for all of the defendants in all of the cases. Cowart would ask each witness in each case if it was not a fact that the party charged did not run the game he was being prosecuted for, every night during the time included in the complaints, except Sunday night, and in each case they answered: "Yes." The gambling cases were all tried before the mayor without the intervention of a jury. Defendant's counsel did not, at any time during the progress of the trials, make an argument either on law or fact. He made no motions, and offered no pleas other than "not guilty."

Charles Mathews was the next witness offered in rebuttal by the defendant. He testified that he was a professional gambler in September and October, 1883, and run a faro bank about two blocks and a half distant from Kain & Campbell's gambling hall. The witness was present at his place, exhibiting his game every night with few exceptions during the spring, summer and fall of 1883, up to about the tenth day of October of that year. Gambling in the city of Dallas had been suspended since the

tenth day of October, 1883, except for a short time on the night of October 26. The gamblers, the defendant and witness among the number, were before the mayor's court of the city of Dallas on the sixth of September and the twenty-ninth of October, 1883, charged with keeping and exhibiting, and being interested in keeping and exhibiting various gambling devices. All the gamblers were tried, and they were used as witnesses against each other. None but gamblers were used as witnesses in any of the cases, and in some instances, on September 5, as many as eight were put on the stand against a single defendant. Dan Stewart and witness, amongst others, were used as witnesses against the defendant Kain. Witness had frequently played keno in Kain's house. Kain was a witness against the witness on his trial, and testified that he was in witness's house only on one or two occasions, and that he had never seen the witness throw a card. Witness testified in the Kain case that he had been in Kain's house several times, but had never seen Kain throw a card, though he had seen the game of keno played there, and knew by general reputation that Kain kept the house.

All the gambling houses in Dallas were opened under a pre-concerted understanding on the night of October 26, 1883. The gamblers were arrested next morning, and were tried in the mayor's court on the twenty-ninth of the same month. The reason that the houses were never opened again was that the sheriff told the gamblers that he was tired of serving so many papers, and that, if the houses were opened again, he would send spotters to the banks and prosecute all who bet or played. When they closed on October 10, 1883, the gamblers knew that if they opened again all the players would be prosecuted. They had such notice from various official sources. They had more numerous notices to that effect prior to the twenty-sixth of October than afterward. Public notices, headed "Fair Warning," were published in the city papers, and were posted throughout the city on or about October 1, 1883.

The gamblers had their reason for reopening after closing on the tenth of October. When they closed on that date, they did so with the *bona fide* intention of not opening again if the authorities would stop their prosecution, or, as they esteemed it, their persecution. But the complaints still continued to "roll in." The sheriff would tell them that he was very tired of serving papers in these cases, but that there were plenty more to be served—a whole basket full. Witness, for one, would ask, with

each new service, "Is this all?" and would get the invariable answer: "I don't know how many more they have got." Accordingly, the gamblers, concluding that they might as well be hung for a sheep as for a lamb, opened, hoping to make some money while they could. This hope, so far as the witness was concerned, was disappointed. He lost two hundred dollars. On the next morning, Kain, or some one from his house, told witness that the sheriff came to Kain's house and told him that he would be forced to close up the gambling houses, and, through spotters, prosecute the players. Thereupon the witness quit. When the gambling business has to encounter persistent prosecution, it is not profitable.

H. Lewis was the next witness to take the stand. Questions were propounded and answers given as follows:

"Do you remember a night in October when these gambling houses opened?"

"Yes, sir, I know."

"You heard they opened?"

"I heard they had opened."

"Didn't you go and see Kain and Campbell?"

"I saw Mr. Kain."

"What did you tell him?"

"I told him not to open that night; told him the sheriff was away."

"Didn't you tell him that the players had been spotted?"

"I don't recollect. I told him that there was a good deal of fuss kicked up about it, and that I was not the sheriff, and didn't want to take any action about it."

"They had already opened that night?"

"Oh, no; that was before. At that time they had not opened, or, if so, I didn't know it."

"That is the next night, I guess?"

"I understood they opened the night before. I don't know whether they had or not."

"Do you know whether they did open that night after you told them not to?"

"I could not say whether they did or not."

"You heard they had opened, and told Mr. Kain?"

"I am certain they did not open that night."

By the county attorney: "They had opened the night before?"

"That is what I understood. I don't know that."

"They have never opened since that?"

"If they have, I don't know it.

"Didn't they (the officers) arrest him every day or two, until they had as many as a hundred cases against Kain?"

"I don't know. I know he was arrested in a great many cases."

R. E. Cowart testified, for the defendant, in rebuttal, that he had no recollection of being in county attorney Clint's office at the time mentioned by Hughes. He did know that, if he was there, he did not know or learn what was being done by Hughes. Knowing nothing about it, he never told Kain, or any one else, anything about it. The witness had no hand in instigating the prosecutions in the mayor's court against Kain, or any other gambler. Witness was employed to defend the gamblers in the trials before the mayor's court, and knew that when the city put Kain on the stand, and he testified against Hennessey, that such proceeding would operate as a bar to any further prosecution, and had that fact in view on the trial had on October 29, 1883. Witness did nothing and said nothing to bring about the arrest and trial of any of the gamblers before the mayor's court, or to procure the testimony of any one against the other. Witness interposed the plea of "not guilty" on those trials. On the trial of Hennessey, Kain testified that Hennessey exhibited a keno table from the thirty-first of March to the twenty-sixth of October, inclusive. The witness represented Kain on his trials in the mayor's court, both on September 6 and October 29, 1883. The city introduced its witnesses, and asked them about each offense named in the complaints on both dates. These witnesses were called by the city, and were placed upon the stand by the city. When the city attorney finished with them, witness interrogated each witness, and covered all the time mentioned in the complaints. Witness then thought that the testimony of the defendant would operate to exempt him from further prosecution under his privilege.

Sheriff Smith was the last witness introduced. He testified that in July, 1883, the gamblers of Dallas told him that they were being too persistently prosecuted, and that if they were to be closed up they wanted to know it. From November, 1882, to July, 1883, the gamblers had paid in fines a larger amount of money than they had paid during the four years preceding. Witness did not then tell them they would be closed up. A short time after the election the county attorney asked witness to join

him in closing up the gambling houses. Witness told him that he had just been inducted into office, and had not fairly got to work, and for that reason could not help him then. He spoke to witness about it several times. The county attorney also went before the grand jury and got them to petition the county commissioners to give him detectives or special police to close up and suppress gambling. He made the same request of the commissioners in person. The commissioners decided that they had not that power. The county attorney then got the witness to specially deputize two men to be paid by him, the county attorney. Witness deputized the two men provided by the county attorney, but declined to embark in the business himself, or to control his regular deputies in the matter. After the detectives were put on in August, no further compromise was made with the gamblers.

The errors alleged in the motion for new trial were that the verdict was contrary to the law and the evidence; that the court erred in its charge to the jury; that it erred in refusing special instructions asked, and that there was error in the verdict, because the jury did not find whether or not there was truth in the defendant's pleas of former conviction, former acquittal and privilege.

The arguments filed in this court are very elaborate, and only those portions closely applicable to contested questions can be given in this repert.

*R. E. Cowart* and *W. B. Dunham*, for the appellant: Keeping and exhibiting, and being interested in keeping and exhibiting, a gaming table, or bank, are continuous offenses.

An offense is, in its nature, indivisible. It may consist of an act, or a series of act. It may be instantaneous in its consummation, or it may require an interval of time. It is, however, but one offense. Assaults and batteries, robberies, thefts, etc., are instances of the first class. Nuisances, carrying weapons, offensive trades and industries, the use of false weights and measures, all illegal businesses and vocations, occupations and pursuits, and a large class of other cases where the offense is directed against the community at large and not against any one individual, such as adultery, bigamy, fornication, etc., are examples of the second class. Probably a decisive test of a continuous offense would be the running of the statute of limitations. In all continuous offenses the statute would commence to run

when the offense terminated. In keeping and exhibiting a gaming table, the offense would be complete and consummated when the party accused commenced to keep or exhibit a gaming table, and the statute of limitations would commence to run when the party accused ceased to keep or exhibit. For instance, in carrying arms the offense would be complete from the very time the party accused began to carry the arms, and would continue until he ceased to carry them. (See Whar. on Crim. Plead., 8 ed., sec. 311.) The Penal Code recognizes the existence of continuous offenses. (See secs. 59, 333, 337, 339, 388, 397, 405, 415, 424, 690, 691.) For a proper construction of such laws, see *Albrecht* v. *The State*, 8 Texas Court of Appeals, 319.

At common law keeping and exhibiting a gaming table was a species of the genus nuisance. (See Bish. on Crim. Law, secs. 1071, 1135, 1137; Whar. Crim. Law, secs. 1410, 1465, 1466; *United States* v. *Smith*, 5 Cranch, 659; *State* v. *Sindler*, 14 Ind.; 2 Bish. Crim. Proc., sec. 489.)

It is contended that a different rule is to be applied to *exhibiting* a gaming table. But we submit that there is no difference in principle between the two offenses, or rather stages in the same offense. A table may be kept by one and exhibited by another. But finally it is the same thing; when a table is kept for the purpose of gaming, it is exhibited, and when it is exhibited it is kept. The offense is complete when the gaming table begins to be kept for the purpose of gaming, though not a single game be ever played upon it. So also the exhibition is complete when the bank or game is displayed for the purpose of obtaining betters, though no bets are made upon it. If it were provided by law that each day or hour a gaming table is kept or exhibited constitutes an offense, then a different rule would apply. (*Burke* v. *The State*, 1 Ohio, 61.)

By the theory contended for, a gambler could evade it by beginning on the first of January of each year, keep up a display for that purpose throughout the entire year, and be guilty of but one offense. It is an offense for a merchant to pursue any occupation without a license. Under the rule laid down by the court below, when he closed his store at night he would cease pursuing the occupation, and would only begin again on the next morning when he opened up. It is the *business* in one case. In the other, it is the *practice*, the conduct, and means of livelihood of the party. We contend, however, that keeping and exhibiting a gaming table constitute but one offense when

so charged.    In the case of *Hinkle* v. *The Commonwealth*, 4 Dana (Ky.,) 519, the following language is used by Chief Justice Robertson:

"Although the setting up of a gaming table may alone be an indictable offense, the keeping of such table and the inducing of any person to bet upon it another, when such shall have been committed by different parties, or at different terms; nevertheless, as they are co-operating acts constituting altogether one offense when committed by the same person at the same time, an indictment for that combined act in violation of law may properly charge the whole in one count; and but one punishment can be inflicted as for one offense." In support generally of the position contended for, the following cases are cited: *Commonwealth* v. *Pray*, 13 Pickering, 364; *Commonwealth* v. *Odell*, 23 Pickering, 275; *Commonwealth* v. *Purley*, 2 Cushing, 184; *Commonwealth* v. *Tower*, 8 Metcalf, 527; *Commonwealth* v. *Elwell*, 8 Metcalf, 463; *Commonwealth* v. *Runnell*, 1 Gray, 388; *Commonwealth* v. *Jenks*, 1 Gray, 460; *Commonwealth* v. *Stone*, 3 Gray, 454; *Commonwealth* v. *Wood*, 4 Gray, 11; *Commonwealth* v. *Gardner*, 7 Gray, 494; *Commonwealth* v. *Bruxton*, 10 Gray, 6; *Commonwealth* v. *Armstrong*, 12 Gray, 49; *Wells* v. *Commonwealth*, 12 Gray, 326; *Commonwealth* v. *McKenney*, 14 Gray, 1; *Commonwealth* v. *Langley*, 14 Gray, 21; *Commonwealth* v. *Taylor*, 14 Gray, 26; *Commonwealth* v. *Kingman*, 14 Gray, 83; *Commonwealth* v. *Gardner*, 14 Gray, 390; *Commonwealth* v. *Eads*, 14 Gray, 406; *Commonwealth* v. *Robinson*, 126 Massachusetts, 259.

The latter case is particularly referred to as containing a masterly exposition of the law on this subject.

A resume of the history of legislation on the subject of keeping or exhibiting gaming banks and tables in Texas will demonstrate the correctness of the propositions herein contained.

The convictions had in the mayor's court were a bar to this prosecution.

By the amended charter of the city of Dallas, the mayor's court had jurisdiction of this offense.    (See *Ex parte Annie Wilson*, 14 Texas, Ct. App., 592.)    It is admitted that a conviction or an acquittal in the mayor's court of this offense, if the offenses were the same, would be a bar.    Section 21 of the amended charter expressly provides that a conviction or acquittal in the mayor's court shall be a bar to any further prosecution. To this, however, it is objected: first, that the convictions were obtained by fraud; and second, that the county court had al-

ready acquired jurisdiction by the information having been filed in said county court before complaints were filed in the mayor's court. The first objection may be dismissed without a word. No charge should have been given on the subject, as there was not a particle of evidence to justify it either as to the conviction had on the sixth day of September or on the twenty-ninth of October, 1883. So far as the conviction had on the sixth of September is concerned, defendant was arrested and tried before the county court had acquired jurisdiction. When tried on that day defendant had not been arrested by the State authorities. He was arrested on the fifth of September, and tried September 6 in the mayor's court. In the county court he was arrested on the sixth of September, 1883, and tried on the twenty-ninth day of January, 1884. Besides, what plea, even if defendant knew he had been informed against in the county court, could he have interposed to defeat the prosecution in the mayor's court? The judge below, in direct opposition to the law governing every other class of cases, held the date alleged in the information to be material. Instead of holding that the date alleged was immaterial so that it was within the statute of limitations, he permitted the State to elect the date named in the information, and held the proof to it.

The law does not demand impossibility, even at the hands of a party indicted for keeping or exhibiting a gaming table. How could he foresee what ruling the court would make? The informations filed September 5, against defendant, charged each of them a separate date, beginning on the twenty-fifth of August and ending on the fourth of September, 1883.

A plea that would have been good for the twenty-fifth of August, would have been faulty for the other dates between that and the fifth of September. It is admitted that in the prosecution on the twenty-ninth of October, the defendant knew he had been arrested one hundred and seventeen times in the county court. The last information in the county court was filed on the tenth day of October. Each information charged a different date—that is, where the information was for the same offense, as faro, keno, etc. If the defendant had filed his plea it would have been, on that date, the twenty-ninth of October, fatally defective. If he had by his plea covered all the dates and all the offenses, from the date first alleged down to the last, on the tenth of October, the time remaining, from the tenth down to and including the twenty-sixth of October, would not have been

covered, and the court would have been compelled to have over-ruled it. Whatever reason there may be for the principle con-tended for, that the court first acquiring jurisdiction absorbs to it to the exclusion of all others, so far as respects offenses con-sisting of an isolated act or acts, as assaults, thefts, etc., there certainly is no reason or sense or justice in applying it to those offenses which consist of a series of transgressions or a series of acts. Suppose one is charged in a justice's court with carrying a pistol, on a complaint filed January 1. Suppose that without being tried before the justice, he is arrested afterwards on infor-mation filed in the county court, February 1. Could he in the county court file any plea which would restrict the State to proof this side of the date of the filing in the justice's court? Suppose, too, that the justice trying the first case should confine the State to the date alleged in the complaint, and suppose that date had been ten days before January 1, then all the time prior to the date alleged in the complaint in the justice's court, and the time between the date alleged and the date of filing, would be uncovered by the proof or by a plea. Suppose, however, he should be tried in the county court first, and the proof went back over two years before that date, and admit that he began to carry the pistol just two years before the filing of the infor-mation in the county court, could he afterwards again be tried in the justice's court, and be convicted on proof covering the same dates covered on the trial of the information in the county court? (See *State* v. *Maher*, 21 American Rep., 269; *Bailey* v. *The State*, 11 Texas Ct. App., 168; *Cock* v. *The State*, 8 Texas Ct. App., 659.)

It is also contended that the convictions in the mayor's court are void because the complaints cover the time between certain dates, and also include a number of offenses. To the first ob-jection it may be answered that in all the precedents the time is alleged in this manner. (1 Bish. Crim. Proc., secs. 393–5; Whart. Prac., title "Nuisance"; Whart. Pl., sec. 125.)

If it be admissible for the State, as was done in this case, to carve out of all the time from the date of filing back for two years just one day, it is also admissible for the city to carve out the time in the one case from May 5 down to the fifth of Sep-tember, and in the other from March 31 down to October 26. It is better to do this in the pleading, as was done by the city, than to do so on the trial, as was done by the county attorney in this case.

The truth is that neither, strictly speaking, is correct. The law has not provided that each day a keno table is kept or exhibited shall constitute an offense. In the absence of such provision, all the time such a table is kept or exhibited prior and up to the date of the filing constitutes but one offense. If the prosecution in such offenses can cut out six months, a month, a day, and make that one offense, they can take each minute, each second, each tenth part of a second, *ad libitum*, and make the smallest appreciable time an offense, and then the number of offenses committed depends not upon the law, but upon the caprice or peculiar views of the prosecution. So far as time is concerned, there is no difference between selecting one day or six months. If one is valid, both are. The defendant has nothing to do with it.

The second objection is equally untenable. The information herein charges six offenses. First, it charges a keeping; second, an exhibiting; third, the combined offense of keeping and exhibiting; fourth, an interest in the keeping; fifth, an interest in the exhibiting; and, sixth, an interest in the combined offense of keeping and exhibiting. There is nothing said expressly about the form of the indictment or information in gaming cases in the Code of Criminal Procedure. The requisites of such indictments or informations are prescribed in the Penal Code, Article 361. It is only necessary to allege that a bank or table was kept or exhibited for the purpose of gaming. An indictment that alleges that John Smith, on a certain day not barred by the statute of limitations, did keep and exhibit, and was then and there interested in keeping and exhibiting, certain gaming banks, gaming tables and gaming devices, for the purpose of gaming and obtaining betters to the same, would be perfectly valid. Under it could be proved every conceivable banking game, every game played on a gaming table, and every gaming device. You could prove four hundred games under such an indictment. There is no misjoinder in misdemeanors, and the doctrine of election does not apply to them. (*Gage* v. *The State*, 9 Texas Ct. App., 259; Bish. Crim. Prac., 8 ed., secs. 452 and 458, and notes.) Besides, such a joinder of offenses Mr. Bishop recommends as the proper practice. (See *The State*, v. *Fuller*, 34 Conn., 280; *Mobile and Ohio Railroad* v. *The State*, 51 Miss., 457; Wharton's Crim. Pl. and Prac., secs., 292, 293, 910.) Whether, under our system, where the punishment in misdemeanors, if the defendant calls for a jury, is assessed by them, such plead-

ing would be advisable may be questioned; that it would be perfectly legal cannot be doubted. (*Leath* v. *Com.*, 32 Grat., Va., 873.) Would the complaints upon which the convictions were had in the mayor's court have been defective on a motion to quash? We submit they could not have been held so. But suppose, for argument's sake, they were defective; the State cannot complain. As defendant did not make a motion to quash, nor move in arrest of judgment, and as he suffered the punishment imposed by the court, the matter is forever concluded. (Wharton's Crim. Pl., secs, 435, 457, 460, 507.)

That the convictions had in the mayor's court are a bar to this prosecution, we think, is too plain for argument. What is the test of a plea of former conviction? It is: Would the facts charged in the second indictment, if true, have been sufficient to have secured a conviction in the first? If they would, the plea is good. (*Lowe* v. *The State*, 4 Texas Ct. App., 34; *Vestal* v. *The State*, 3 Texas Ct. App., 648.)

His honor the judge below charged that the burden of establishing the truth of the defendant's plea to the satisfaction of the jury devolved upon the defendant. It is submitted that this is stating the rule too strongly. But admit, for the sake of argument, that the rule laid down is the correct one; how, then, is that burden met and shifted? There are, it seems to us, but three ways in which it can be done: first, by producing the record, that is, the complaints and judgments on them, and showing that the same evidence which is necessary to support the prosecution by information would have been admissible and sufficient to procure a legal conviction on the complaints. A *prima facie* case on this point being made out by the defendant, it was then incumbent on the prosecution to meet it by proof that the offense charged in the information in this case was not the same as that charged in the complaints upon which the defendant was convicted in the mayor's court. (Greenl. on Ev., sec. 36. See, also, the case of *Dunham* v. *The People*, 4 Scammon, Ill., 172, and which is also contained in 39 Am. Dec., 407, and reported by Mr. Freeman as a leading case on the subject.)

But grant, for the sake of argument, that the production of the complaints and judgments in the mayor's court were not sufficient to make out a *prima facie* case for the defendant, and shift the burden. Then, secondly, how could that burden be removed? It could be removed by showing that the issues were

the same in both cases—that is, the keeping and exhibiting, and being interested in keeping and exhibiting a keno table.

The date.is not material so that it is within the statute of limitations. Then the judgments in the mayor's court founded on the complaints filed on September 5, 1883, and October 27, 1883, are conclusive, and not only embrace the matters which were actually determined in the case, but also extend to every other matter which might have been litigated in the cases. On the trial of the complaints, would not evidence of a keeping and exhibiting, when and as charged in the information herein, have been relevant and admissible? (See Wells, *Res Adjudicata*, p. 220, secs. 251, 253, *et seq.*) If it would have been, then the judgments of the mayor's court are *res adjudicata*, because matters cannot be re-litigated which might have been settled on the trial of the first case.

Suppose, however, that we are wrong in both these positions; then, thirdly, how can the burden be met? By showing that evidence of the same offense charged herein was introduced on the trials in the mayor's court. It is shown by the testimony of defendant's witnesses that in the trials in the mayor's court the proof covered all the time between the dates alleged, except Sunday, and that defendant was interested in keeping and exhibiting a keno table between the dates in both complaints.

Defendant having been subpœnaed and testified against other parties prosecuted for the same offense charged against him herein, on September 6, in the mayor's court, and on the twenty-ninth of October, 1883, in the same court, he is exempt from prosecution for all violations of the law about which he testified prior and up to the date of his so testifying.

*C. F. Clint*, for the State: For the sake of convenience, we treat of appellant's pleas separately, commencing with the plea of former conviction. The *onus* of this issue is on appellant. If, after he has adduced his affirmative proofs and arguments, it remains a matter of doubt as to whether the cases in which he was tried or testified are the same as the one at bar, the doubts must be resolved against him. For, even in civil affairs, he who assumes to affirm a fact must get beyond the sphere of doubt with his proofs; must carry them at least to a preponderating extent. I believe the very proofs adduced by appellant in support of this issue, not only raise a doubt as to whether the cases set out in his pleas and this one are the same, but show that

they are not one and the same. The most casual glance shows that, on the face of things, the city complaints and county court information bear little, if any, resemblance to one another. It is true, as a matter of time, the county court case is contained in the mayor's court complaints, but that does not suffice under a plea of former conviction to establish their identity, especially as time is charged in said complaints. Because they cover six months of time, or one hundred and fifty days, and the county court information happens to charge a day within the number, does not establish that both are identical in point of time. Under a plea of former conviction the time must, in deed and in truth, be shown to be exact and identical with the time of the case at bar. A mind with microscopic powers and infallible precision could not, even aided by the most lively imagination, by any process known to law, logic or philosophy, torture one hundred and fifty days into being identical with one day, and that day the twenty-seventh of August, 1883, without evidence clearly showing that the city elected to confine itself in the prosecution of the case to that day, which evidence does not exist.

But again, under all rules of pleading as to the averment of time, the city court complaints charge no time. For an uncertainty in the averment of time is in legal contemplation equivalent to no averment whatever of time. Therefore, as the city complaints charge no time, in the very nature of things it is impossible for appellant to show that in point of time the cases are the same. (1 Bish. Crim. Proc., sec. 239.) It will be seen that, if the city complaints are good as to time at all, it is on the fifth day of May, in the September case, and on the thirty-first day of March, in the October case, which lacks several months in either case of being the same as that charged in the county court case. (1 Bish. Crim. Proc., sec. 240.) So far, therefore, as the face of the complaints go, appellant has shown no identity between the cases.

But suppose the time to be legally charged as charged, do the witnesses, as to time, identify the offenses? There is no evidence whatever on this point. Barring the feature of time, do the offenses, as charged in the city complaints and county court information, appear, from the face of both, to be identical and the same, so far as the nature of the offense is concerned? The county court information charges keno. What do the city complaints charge? Nothing. They are void because of duplicity. Would an indictment which in one count charged theft,

embezzlement, swindling and robbery, be good as to any one of the four offenses charged? And if so, which one? That the offenses charged are different, separate and independent offences will presently more fully appear. Suffice it now to say that if the complaints charge no offense, it would be impossible to say that, in point of the nature of the offenses charged, the cases are the same. But supposing the nature of the offenses as charged to be legally charged, are they, on the face of things, the same? Can you call faro, keno, high ball poker, and horse head under the name of keno? Can you identify keno as being faro, keno, high ball poker and horse head? Certainly not. Then, no evidence of exact identity can be gathered from the face of the papers.

Do the witnesses render the convictions had under the city court complaints identical with keno? No word of testimony shows it. It will be remembered that the city did not, of its own accord, or at the instance of appellant, elect to prosecute appellant for any one of the several offenses charged in the above complaints, nor elect any specific day or act, on which to proceed against him. But, so far as the record shows, the evidence introduced by the city may have been for one specific day or violation; or it may have been for all the different offenses and for the whole time charged in each complaint. The evidence is a perfect blank as to what offense or offenses appellant was convicted of, and for what time. So far as the proof shows, it may may have been roulette or horse head, or high ball poker, or faro, or wheel of fortune, or keno. There is not the slightest evidence tending to show that his conviction was had for keno. Nor is there a particle of testimony which shows that the offense or offenses were committed on the twenty-seventh of August, much less that his trial in either case was for keno on the twenty-seventh of August.

As a matter of law, the keeping and exhibiting gaming banks and tables is not a continuous offense. The keeping of gaming houses was forbidden at common law, principally as a nuisance, but gambling, *per se*, was not an offense under that system. It was the nuisance feature attached to gambling at common law that made it continuous in its nature, or that caused it to be so treated. But under our statutes no part of it is treated as a nuisance. Under our statute it is, *per se*, an offense. Even the mere act of renting for gaming purposes is, *per se*, an offense. (6 Texas, 425; 1 Bish. Cr. L., 504, 1135.) It is prohibited in Texas

in nearly all its forms, and under strict and comprehensive legislation.  On this offense common law authorities will be of no avail to the practitioner, nor even the decision of other States, as our statutes on the subject are *sui generis*.  (Webb's Cr. L., 235.)   This offense occupies the same status in our Penal Code that all other acts made penal, *per se*, occupy.

As to the appellant's legal status under his plea of privilege: Under the evidence it will be seen that appellant testified against one Ed. Hennessey, in the mayor's court, in behalf of the city, on September 6, 1883.   His evidence covered the period of time averred in the complaints.   The statute under which appellant was called to testify says, that any person summoned and examined shall not be liable to prosecution for any violation (not violations) of said articles about which he may testify.   (Penal Code, Art. 367.)   When it is remembered that this article was enacted in behalf of the State's interest, looking to the more effective prosecution of gamblers, and that a gambler is only given immunity under it from punishment as a consideration for his testimony, we will have little, if any, difficulty in measuring the relative rights and obligations of both the State and defendant, under the contract between them, which grows out of this statute.   The State, on her part, undertakes to protect him against any violation about which he may testify.   He goes upon the witness stand at the instance of the State, under this promise, and by virtue of it is compelled to testify to a violation.   The promise from punishment only extends to a violation, and the compulsion that he is under to testify only extends to a violation.   Suppose he testifies beyond the law's promise, and the law's compulsion, under what covenant in his contract can he afterwards claim protection from the consequences of such testimony?  None whatever.   The only benefit he conferred, or could confer, was in his testimony relating to the one violation.   It was never contemplated that a man should be exempt from two violations for testifying as to one, and certainly never intended that a man should be exempt from seven hundred and thirty violations for having testified in one case.   That would lead to the very opposite of what was intended by the law—an encouragement instead of suppression of the offense.

A witness will not be heard to say that he was compelled to testify to the time covered in the complaint, if it covers more than one offense, because, after he testifies to one, he is supposed to know that no compulsion can be used to make him

testify about others, and if the power to compel has ceased, the right to protection has also ceased. A court under this statute has no jurisdiction to hear more than one offense at a time, and, therefore, no jurisdiction to compel the giving of testimony to more than one violation, and, therefore, no power to fine, as for a contempt of court, or to require a witness to go further than the law compels him to and protects him in going. And if, knowing this (and in law a witness is bound to know), he consents voluntarily to proceed, he cannot be considered injured in law if, through the testimony then given, he is himself afterward convicted. For a maxim says, "That to which a man consents cannot be considered an injury." (Wharton's Maxims, 213, M. 99.)

In this case the above maxim is peculiarly applicable, for appellant, at the very time he consented to go farther than the law compelled him to go, was being represented by able counsel present there, not only to protect and advise him against it, for his own sake, but also the vital interest of the client whom he was then representing, and against whom appellant was testifying. He not only consented to disclose more than one violation, but the testimony of his counsel in this case shows that they both desired to have the examination include as many violations as possible, with a view to taking advantage of it in this and other cases then pending in the county court. This statute was enacted in the light of what the law required and permitted to be averred in a complaint, and not what, for some reason of his own, a pleader might see proper to aver. The law permits but one violation to be charged, and but one conviction for the violation; and when it declares that a witness should be exempt from punishment for any violation, it meant exactly what the words literally and spiritually import, in the light of *bona fide* rules of pleading.

Officers are presumed to know the law and follow it, and the Legislature acted on this presumption. It had no idea that a complaint would ever be drawn charging seven hundred offenses, and the provisions of this statute be resorted to to sustain it. Or that a witness could be found who would voluntarily aid in supporting it, and then attempt to torture its provisions into a shield for his protection against the laws of the land. The law will not permit itself to be so construed as to become a harbinger for crime, or an instrument of danger to the country's good. I do not believe that even the most abandoned construction of

this statute will permit a defendant to say that because he has testified to a period of time that includes this particular offense, therefore he has testified to this violation or offense.

Of course appellant, in order to be entitled to protection against this prosecution, must be able to show that he testified to this identical violation. I submit that he has signally failed to do it. In fact, appellant has no desire to prove that either his plea of former conviction or privilege relate directly and exactly to this identical offense, for that would perhaps preclude him from using the same old convictions and swears in the remaining one hundred and eighteen cases against him. And he will, of course, pursue no course that would have that result. His argument must, therefore, adapt itself to a use of the pleas in each case, not only of keno, but faro, high ball poker, etc. Will such a course be permitted? Is a man to be permitted to say, when being tried for keno, that he was convicted for keno? and when prosecuted for faro, to say he was convicted of faro? and when tried for horse head, etc., that he was convicted of each one of these? and offer each time the same old conviction to sustain the plea each time? Is one conviction so prolific as to produce from within itself one hundred and nineteen convictions? Is testifying in one case so prolific a source of defense that it can produce at will one hundred and eighteen pleas in bar? Are pleas of former conviction and privilege such pliant and elastic tools? Not unless the office of each has degenerated from their wonted prestige and power and genuine usefulness, into the servile spaniels of a base purpose; not unless their former palladium functions have departed.

As appellant has failed to show either that he was ever convicted, or has testified in this identical case, his pleas of former conviction and privilege should be held not sufficient defense to this prosecution.

*J. H. Burts*, Assistant Attorney General, also for the State.

Hurt, Judge. The information in this case alleged that appellant Kain kept and exhibited, and was interested in keeping and exhibiting, a keno table, on the fourth day of September, A. D. 1883.

To the information the appellant pleaded not guilty, former conviction in the mayor's court of the city of Dallas, former conviction and acquittal in the county court, and privilege from

T

prosecution by reason of having been summoned and testifying in certain cases before the mayor's court, in which the parties prosecuted were charged with the same offense contained in this information.

The evidence in support of appellant's pleas of former conviction and acquittal failing to show that the offenses were the same in point of *identity of transaction*, it is absolutely necessary to assume and sustain the proposition that the offenses for which appellant had formerly been convicted or acquitted were, in their nature, continuous, and the learned counsel, perceiving this necessity, in his very able and exhaustive brief states the following as his first proposition: "Keeping and exhibiting a gaming table, or bank, are continuous offenses."

The question, therefore, is this: Are these offenses continuous in their character? If they are, the pleas of former conviction and acquittal can and should have prevailed.

These, we think, are correct propositions:

1.  An offense is indivisible.

2.  It may consist of a single act, or a series of acts.

3.  It may be instantaneous in its consummation, or it may require an interval of time. It is, nevertheless, but one offense.

A brief analysis of the above propositions will lead us to an easy solution of the main question, which is: Are the offenses of which defendant was convicted, or acquitted, continuous? While it is true that an offense is indivisible, still if it consists of a single act, or a series of acts, and to consummate it an interval of time (such an interval of time as is meant by certain authors and in opinions of Supreme Courts) is not required, it is not continuous in its nature. We deem it unnecessary to enter, at this time, upon an explanation of what is meant by "*interval of time*," contained in the third proposition above. For it will not seriously be contended that an offense consisting of but a single act is continuous in its nature.

Of what act, or acts, does the offense consist of which the defendant stands charged? Of keeping and exhibiting a keno table. Now, while it may be true that keeping a table is continuous in its character, very evidently, without aid from the Code, exhibiting is a single act and is not continuous. But we are not left to speculate or reason upon this subject, it being placed beyond cavil by the Code itself. Article 363 determines, in a manner not to be doubted, whether *exhibit* is continuous, or a single act; it speaks to this court in this unmistakable language:

" The word exhibited is intended to signify the act of displaying the bank, or game, for the purpose of obtaining betters."

Exhibiting is made the act, and this act is made penal, and for this act defendant was convicted, the evidence showing him guilty of the same. Now, if defendant, on the fourth day of September, 1883, "exhibited a keno table for the purpose of obtaining betters," he violated the law of this State, for which the State had the right to demand the penalty. If he exhibited the table for this puprose, he committed an act forbidden by positive law, to which was annexed, on conviction, prescribed punishment. The State, however, neither in reason, justice or law, could demand but one conviction and punishment, and hence he pleads that he has been convicted, or acquitted, of this offense. Has this plea been sustained by him upon the trial? Upon whom is the burden of proof, and what must he prove to make good these pleas, or either of these pleas?

1. The burden is upon defendant.

2. He must prove the record.

3. Prove orally or otherwise the averment of identity of defendant and identity of offense.

"Prove identity of offense." Will proof of identity in the name of the offense, or identity in the elements of the offenses, discharge the burden? Unquestionably not. Just at this point it becomes of the first importance to revert to what constitutes an offense. An offense is an act or omission, * * * Hence, the burden being on defendant to prove his pleas, and identity of offenses being averred (and a necessary averment), an act or omission, being the offense, to discharge the burden he must prove the identity of the act or omission, and in this case, as omission does not enter into the composition of the offense, he must prove identity of the act.

Upon this subject Mr. Wharton, in his work on Criminal Pleading and Practice, says: "The burden of proving a prior conviction of the offense charged against a defendant being upon him, it is not shifted by *prima facie* evidence of the identity of offense of which he has been previously convicted with that charged upon him." To this proposition as stated, without modification, we cannot agree, for if the evidence makes a *prima facie* case in support of the plea, it must preponderate in its favor, and a preponderance of proof will suffice to support the plea.

A very good illustration of the rule sought to be stated by

Mr. Wharton above will be found in *Commonwealth* v. *Daley* (4 Gray, 209), a case cited by him in support of his rule. In that case Daley was being prosecuted under a complaint which charged him with selling intoxicating liquors on the eighth day of December, 1854, to one Jonathan Pierce. Daley's plea was *autrefois convict*. At the trial it appeared by the record of the former conviction that the sale there mentioned was to Jonathan Pierce, and the evidence was that the same witness testified on the former trial who was relied on to support this complaint, and that the only sales ever made by the defendant to Pierce were on the two separate days in January, 1854.

Under this state of facts the defendant Daley requested the judge to instruct the jury that "in order to obtain a conviction in this case the commonwealth must show on which of the sales the first conviction was had," but the judge declined to so instruct the jury. Daley, being convicted, appealed to the Supreme Court, and in that court insisted on a reversal of the judgment because the trial judge refused to submit to the jury the instruction above. The Supreme Court took a different view of that subject from that of counsel for Daley. Justice Bigelow, who delivered the opinion of the court, disposes of this matter as follows: "On the trial of the issue raised by the plea of *autrefois acquit*, the affirmative was upon the defendant. It is for him to maintain by proof the allegation in his plea of previous conviction, and to establish the identity of the offense charged in the complaint, or indictment, with that of which he stands convicted. Now, Daley did not make a *prima facie* case in support of his plea. It was in doubt on which of the sales the first conviction was had; he, by his requested charge, sought to cast the burden on the commonwealth to clear up the doubt by showing upon which sale he had been convicted, and by making this proof to establish a negative, that is, *that Daley had not been tried and convicted* of the offenses for which a conviction was then demanded. The Supreme Court, however, held that this was defendant's duty, and not that of the commonwealth; that he must prove that, in fact, he had been convicted for the sale charged in the complaint upon which he was then being tried.

Applying, then, the principle contained in that case to the case in hand, evidently neither of the pleas is sustained by the evidence, for upon defendant the burden rested to prove identity of offense—identity of act—this offense consisting of the act of

displaying the bank, or game, for the purpose of obtaining bet-
ters. The appellant must prove not merely that he has been con-
victed of exhibiting keno for the purpose of obtaining betters at
divers times, but that he had been tried and convicted or. ac-
quitted of the very act of displaying the keno table for which
he was then being tried.

It may be urged, however, that in all of the prosecutions, as
appellant was charged with *keeping* the keno table for the pur-
pose of gaming, as well as *exhibiting* the table, and as the ver-
dicts and judgments fail to show for which, the keeping or the
exhibiting, he was convicted, that he is relieved of the burden
of proving the identity of the offense—the act of exhibiting.

Concede, for the argument, that keeping the table is a contin-
uous offense, and the above proposition becomes very plausi-
ble indeed. But keeping a table for gaming and displaying it
for the purpose of obtaining betters are different and distinct
acts, and, though the punishment may be the same, certainly the
acts are not the same. And while it may be conceded, under the
rules laid down in quite a number of well considered cases, that
keeping certain banks, or tables, for the purpose of gaming, is
an offense continuous in its nature, yet it does not follow that
the act of displaying these banks, or tables, is continuous.

But let us suppose that the evidence, the whole record, leaves
it in doubt as to whether defendant had been convicted of the
keeping of the keno table, which is for the argument continu-
ous, or convicted of the act of displaying the keno table for
the purpose of obtaining betters, would such evidence meet and
discharge the burden which rests upon defendant to prove the
identity of the act of displaying the table on the fourth day of
September, 1883? We are clearly of the opinion that it would
not. The evidence in support of the pleas of former convictions,
or acquittal, must meet the whole case, to wit: the act of dis-
playing, as well as the keeping, unless the keeping, in its ele-
ments, includes all of the elements of "displaying the bank, or
table, for the purpose of obtaining betters." That the act of
displaying the bank, or table, for the purpose of obtaining bet-
ters is not included in the charge of keeping a bank, or table,
for the purpose of gaming, is quite evident.

We are of the opinion: First, that the act of displaying a
bank, or table, for the purpose of obtaining betters is not a con-
tinuous offense. Second, that the burden is on the defendant.
to sustain his pleas of former convictions or acquittals. Third,

that to meet and discharge the burden, it is incumbent upon him to establish by the evidence the identity of the act, or acts—keeping and displaying—these being charged in the information for which he has been tried and convicted, or acquitted. Fourth, that the record before us fails to furnish such proof, and his pleas were not sustained.

This disposes of the pleas of *autrefois convict* and *autrefois acquit*—former convictions and acquittals—alleged to have been had in the mayor's and county court.

At this point we deem it necessary to express an opinion in reference to a proposition earnestly insisted on in argument and brief of the learned county attorney representing the State in these cases. That proposition is that the court first acquiring jurisdiction of the case should hold it to the exclusion of all other courts, though they may have concurrent jurisdiction. Under this proposition, it is contended by the county attorney that though appellant had been regularly tried, convicted, or acquitted, of the very act, or acts, charged in the information upon which appellant was then being tried, still, as this information was pending upon the institution of the prosecutions in the mayor's court, that court could not legally take jurisdiction of the case, and that any conviction, or acquittal, had under the circumstances could not be pleaded in bar to a prosecution under the former pending information. All fraud apart, we cannot agree to the correctness of this proposition.

Let us illustrate: A steals a horse in Ellis county, carries it to Dallas county, and there sells it. He is indicted in Ellis county on the first day of January, and in Dallas on the fourth of the same month. Capiases issue on both indictments, and he is arrested on that from Ellis county; gives bond, and is arrested by the sheriff of Dallas county and placed in jail. On the tenth he is called upon to answer the indictment in the district court of Dallas county, and pleads in abatement the pendency of the indictment in Ellis county, and his arrest thereunder.

This court held, at its last Galveston term, that such a plea could not be interposed. A's plea being overruled and held for naught, he is forced to trial and convicted. He is carried to Ellis county and there placed on trial for the same offense, when he pleads *autrefois convict*. Shall he be told that his plea will not avail him, and that he must be tried, convicted and punished twice for the same theft? Common justice must answer these questions in the negative.

In this case both courts have jurisdiction of the theft—the jurisdiction is concurrent. Now, suppose that in these cases against the appellant, the city attorney of Dallas, in good faith, without collusion with, or without fraud upon the part of the appellant, had instituted these prosecutions against the appellant, the appellant could not, under the decision at Galveston term, have interposed the prior pendency in the county court of prosecutions for the same offenses, and therefore the practical result to him would have been two convictions and punishment for the same offense, if cut off from his plea of former conviction. We are aware that the county attorney is very clearly and cogently supported in his position, and that too by courts and judges of the most excellent character. But we believe that under our Code of Procedure and Constitution of the State, the correct doctrine in this State is that which allows the plea of former conviction or acquittal, under the above state of case.

We now come to appellant's plea of privilege. Article 367, Penal Code, provides that, " any court or officer having jurisdiction of the offenses enumerated in this chapter, or any district or county attorney, may subpœna persons and compel their attendance as witnesses. Any person so summoned and examined shall not be liable to prosecution for any violation of said articles about which he may testify."

"A witness so summoned and examined shall not be liable to prosecution for any violation of said articles about which he may testify." Let us suppose that the witness has been engaged in keeping and exhibiting banks and tables for two years prior to the commencement of the prosecutions against him; that some of his patrons have been prosecuted for betting at these games, and that the witness was subpœnaed and examined by the State in these prosecutions; that he testified to the keeping and exhibiting of and betting at these games, on a particular day or time; now, will the fact that he was subpœnaed and examined in relation to this particular transaction relieve him from all prosecutions for violation of the provisions of the articles " about which he testified;" or will he be exempt from prosecutions only as to the particular transactions about which he testified? The privilege is granted him of being exempt from prosecution in consideration of the right to refuse to answer questions criminating himself, which the statute takes away from him. So far as by virtue of the statute he has been compelled to testify as to any particular violation of the law the statute will protect him, but

we see no reason why it should grant him any broader protec-
tion than that of which he has been deprived.

The record fails to show that he testified about this particular
transaction, and hence his plea of privilege cannot avail him.

We will not discuss the question as to whether there was col-
lusion between the city authorities and appellant, or fraud on
his part in procuring the mayor's court to assume jurisdiction
over these cases, for conceding every step taken in the mayor's
court in the prosecution of these cases to have been strictly in
good faith, with all fraud apart, appellant failing to prove the
identity of the offenses, this question becomes of no import-
ance.

We have examined the charge of the court very carefully,
and are of the opinion that it is in harmony with the views ex-
pressed in this opinion.

While we have refrained from discussing *seriatim* all the
questions raised in the brief of appellant, we have carefully ex-
amined them all and the authorities therein cited for their sup-
port, and in conclusion, we deem it but due to counsel for appel-
lant to say that we have rarely had the pleasure of examining
a more able and exhaustive brief and argument in any case in
this court than that filed by him in this case.

We have carefully examined the entire record, and finding no
error therein which requires a reversal of the case, the judg-
ment is affirmed.

*Affirmed.*

Opinion delivered May 22, 1884.